**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jerry Clark,<br><br>              Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>              Defendant. | No. CV-20-02466-PHX-MTL<br><br>**ORDER** |

Plaintiff Jerry Clark challenges the denial of his Application for Disability Insurance Benefits under the Social Security Act by Defendant, the Commissioner of the Social Security Administration ("Commissioner"). Clark filed a Complaint with this Court seeking judicial review of that denial (Doc. 1). The Court now addresses Clark's Opening Brief (Doc. 13, "Pl. Br."), Defendant's Response Brief (Doc. 18, "Def. Br."), and Clark's Reply (Doc. 19, "Reply"). The Court has reviewed the briefs and Administrative Record (Doc. 12, "R") and affirms the Administrative Law Judge's ("ALJ") decision.

**I.    PROCEDURAL HISTORY**

Clark completed an application for Disability Insurance benefits in June 2011 alleging disability beginning November 1, 2008. (R at 237.) The Social Security Administration denied Clark's claim at the initial and reconsideration levels of administrative review. (R at 181–84, 190–93.) Clark timely requested an administrative hearing. (R at 194–95.) An ALJ conducted a hearing on October 29, 2012. (R at 60–90.) At that hearing, Clark testified under examination by his attorney and the ALJ. The ALJ

issued an unfavorable decision on January 24, 2013. (R at 27–46.) The Social Security Appeals Council upheld the ALJ's denial in a letter dated May 29, 2014. (R at 1–6.) On July 25, 2014, Clark filed a complaint in the U.S. District Court for the District of Arizona. (R at 2270.) The District Court reversed the ALJ and remanded the case for further proceedings on April 15, 2015. (R at 2282–2289.)

On June 5, 2017, an ALJ conducted a second hearing. (R at 2204–2241.) The ALJ issued a second unfavorable decision on September 5, 2017. (R at 2176–92.) The Appeals Council denied review on June 27, 2018 (R at 2166–2171), and Clark again sought judicial review on August 22, 2018. (R at 4731.) The United States District Court reversed the ALJ, again, and remanded the case for further proceedings on September 30, 2019. (R at 4735–43.)

On April 30, 2020, an ALJ conducted a third hearing telephonically. (R at 4644–91.) The ALJ issued a third unfavorable decision on June 8, 2020. (R at 4494–4524.) The Appeals Council denied review on November 12, 2020 (R at 4482–87), and Clark again filed suit on December 23, 2020. (Doc. 1).

## II.     LEGAL STANDARD

In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a preponderance; it is relevant evidence that a "reasonable mind might accept as adequate to support a conclusion" considering the record as a whole. *Id.* (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)). To determine whether substantial evidence supports a decision, the Court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas*

*v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citation omitted). Finally, the Court may not reverse an ALJ's decision on account of an error that is harmless. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006). "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d 1104, 1119 n.11 (9th Cir. 2012) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). "An error is harmless if it is inconsequential to the ultimate nondisability determination, or if the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citations and internal quotation marks omitted).

   To determine whether a claimant is disabled, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled, and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled, and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. *Id.* At step four, the ALJ assesses the claimant's RFC and determines whether the claimant is still capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled, and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where the ALJ determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if not, the claimant is disabled. *Id.*

### III. THE ALJ DECISION

The ALJ issued the third unfavorable decision in this matter on June 8, 2020. (R at 4494–4524.) Noting an unfavorable decision on a prior application for benefits from 2006, the ALJ found that Clark's current claim is subject to a continuing presumption of non-disability,[1] and that Clark rebutted that presumption by alleging the existence of a new impairment not previously considered. (R at 4497–98.) The ALJ noted Clark's insured status for Title II benefits expired December 31, 2011. (R at 4498.) The ALJ found that Clark had not engaged in disqualifying substantial, gainful work activity, and that he suffered from severe medical impairments through his date last insured, including status-post left knee replacement, left shoulder surgery, lumbar degenerative disc disease, right knee osteoarthritis, depressive disorder, and posttraumatic stress disorder. (*Id.*) The ALJ found that Clark's severe impairments did not meet or medically equal the requirements of a Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R at 4499–4500.) The ALJ concluded that Clark could perform light work with the ability to stand or walk for four hours, sit for four hours, remain on task while seated at a workstation, occasionally interact with supervisors, coworkers, and the public, and work in the vicinity of others.[2] (R at 4500–4501.) The ALJ rejected Clark's symptom testimony citing clinical evidence that his mental impairments were stable, inconsistent statements regarding his drug and alcohol use, activities of daily living, and a medical source statement in the record which may have been altered. (R at 4505.) The ALJ rejected the state agency psychiatric opinion at the initial level; assigned "partial weight" to the opinions of the state agency medical reviewers and the psychological consultative examiner, Dr. Brent Geary; "mostly significant weight" to the consultative examiner, Dr. William Chaffee; and "little weight" to the opinions of Clark's treating doctors, including Jack Hawks, D.O. (his treating family physician) (R at 4478–81, 5035–41), Salvatore Lacognate, D.O. (orthopedic surgeon) (R at 2161),

---

[1] *See Chavez v. Bowen; Effect of A Prior Final Decision That A Claimant Is Not Disabled, & of Findings Contained Therein, on Adjudication of A Subsequent Disability Claim Arising Under the Same Title of the Soc. Sec. Act*, SSAR 97-4(9), 1997 WL 742758 (Dec. 3, 1997).

[2] The ALJ assigned other postural and environmental limitations. (R at 4500–4501.)

Paul Fredette, M.D. (psychiatrist) (R at 2636–42) and Thomas Buenker (psychiatrist) (R at 1280–87). (*See* R at 4501–11.) The ALJ assigned "little weight" to Clark's Veterans Affairs disability rating. (R at 4510–11.) The ALJ concluded Clark could not perform his past relevant work through his date last insured, but that he could perform other jobs in the national economy. (R at 4511–13.)

**IV.     DISCUSSION**

Clark presents two issues on appeal. First, whether the ALJ improperly rejected the opinions of Drs. Buenker, Hawks, and Fredette. (Pl. Br. at 8–18.) Second, whether the ALJ improperly rejected Clark's VA disability rating (*Id.* at 18–22).

**A.      Clark's Treating Physicians**

While "[t]he ALJ must consider all medical opinion evidence," there is a hierarchy among the sources of medical opinions. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Those who have treated a claimant are treating physicians, those who examined but did not treat the claimant are examining physicians, and those who neither examined nor treated the claimant are nonexamining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id.* This is because treating physicians have the advantage of in-person interaction and typically a longer history of treatment than a claimant's other doctors, and their "subjective judgments . . . are important, and properly play a part in their medical evaluations." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Given this hierarchy, if the treating physician's evidence is controverted by a nontreating or nonexamining physician, the ALJ may disregard it only after "setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). An ALJ can satisfy this obligation "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *see also Embrey*, 849 F.2d at 421–22 ("The ALJ

must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). Here, the medical opinions at issue are controverted by other doctors' opinions in the file.[3] But, as further explained below, the ALJ provided specific, legitimate reasons supported by substantial evidence for rejecting them.

                1.        Dr. Thomas Buenker

In September 2012, Clark's treating psychiatrist, Dr. Thomas Buenker, completed a "Psychiatric/Psychological Impairment Questionnaire" outlining his opinion regarding Clark's restrictions and limitations. (R at 1280–87.) Dr. Buenker listed Clark's mental health diagnoses as Posttraumatic Stress Disorder, Depressive Disorder, and "Cluster B Traits," and assigned a global assessment of functioning ("GAF") score of 55. (R at 1280.) Dr. Buenker indicated Clark had a "fair" prognosis. (*Id.*) Among the clinical findings supporting Dr. Buenker's diagnoses, he noted poor memory, sleep disturbance, decreased energy, mood disturbance, hostility and irritability, emotional lability, difficulty thinking or concentrating, feelings of guilt and worthlessness, intrusive recollections of a prior traumatic experience, and suicidal ideation or attempts. (R at 1281.) Dr. Buenker assigned Clark marked limitations in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[4]

---

[3] For instance, the consultative examiner, Dr. William Chaffee, opined Clark could stand or walk for up to two hours, and sit for six-to-eight hours, in an eight-hour workday. (R at 841–42.) Dr. Jack Hawks, Clark's treating physician, opined Clark could only stand or walk for less than one hour cumulatively, and sit for less than one hour, in an eight-hour workday. (R at 4478–79.)

[4] According to the assessment form, "markedly limited" means the limitation "effectively

(R at 1283–85.) Dr. Buenker noted that Clark was incapable of even "low stress" work environments. (R at 1286.) He estimated that Clark would be absent from work more than three times a month. (R at 1287.) At the third hearing, the vocational expert testified an individual precluded from performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances would be unable to do competitive work. (R at 4688.)

In the decision, the ALJ assigned Dr. Buenker's opinion "little weight" (R at 4508), asserting it was "simply not consistent with the medical evidence of record during the relevant period," including evidence of normal mental functioning and Clark's daily activities. (R at 4509.) The ALJ found the "marked limitations" that Dr. Buenker assigned were contradicted by Dr. Buenker's assigned GAF score of 55, which is indicative of only moderate symptoms. (*Id.*) The ALJ concluded that Dr. Buenker's treatment notes did not support the drastic limitations he assigned, and that his treatment of Clark "was often conservative, consisting of . . . changes in medication, psychoeducation, and encouragement to limit alcohol consumption and medication regimen compliance." (*Id.*) Addressing Dr. Buenker's conclusion that Clark's substance use was merely a symptom of his underlying mental health impairment, the ALJ noted this would not alter his analysis, as the ALJ found the aggregate of Clark's symptoms including those derived from substance use were not disabling. (R at 4510.) Clark argues these reasons are insufficient, and that "reversal is required" due to the ALJ's failure to discuss the several factors for considering opinion evidence enumerated in 20 C.F.R. § 404.1527(c). (Pl. Br. at 10; *see id.* at 8–14.) The Court will address each point in turn.

          a.     Inconsistencies with the Medical Record

Noting clinical references to Clark's "alcohol use, frustration and anger," the ALJ found Dr. Buenker's disabling opinion was belied by indications of "normal mental functioning" and Clark's daily activities. (R at 4508–09.) The ALJ cited mental status

---

precludes the individual from performing the activity in a meaningful manner." (R at 1282.) Dr. Buenker also assigned several mild and moderate limitations. (R at 1283–85.)

- 7 -

examinations indicating a calm mood and congruent affect; goal-directed thought processes; denial of difficulties in memory, concentration, or problem solving; intact attention, memory, and concentration; and adequate insight and judgment. (R at 4509.)

Clark characterizes the ALJ's analysis as "cherry-picking" a modicum of evidence "not representative of Clark's functionality" from a record containing 3,853 pages of medical records. (Pl. Br. at 10.) Alternatively, Clark argues that the evidence cited by the ALJ—including treatment notes indicating no "mania, abnormal affect, hallucinations, impaired insight, and impaired judgment"—is consistent with the symptoms Dr. Buenker listed as supporting Clark's diagnoses. (*Id.* at 11.)

The Court finds that the normal mental status findings the ALJ cited *do*, in fact, contradict the symptoms Dr. Buenker checked-off on his form. For instance, Dr. Buenker cited difficulty thinking or concentrating and poor memory as clinical findings supporting Clark's diagnoses (R at 1281), but the ALJ cited evidence of goal-directed thought processes and normal memory—findings which facially contradict Dr. Buenker's form. (R at 1281, 4509.) Clark accuses the ALJ of cherry-picking, but after reviewing the medical record, the Court finds the collection of treatment visits the ALJ cited are generally consistent with the record as a whole.[5] Further, while Clark emphasizes that the ALJ cited only a handful of the 3,853 pages of medical evidence, only a portion of those thousands of pages actually pertains to the period of Clark's insured status, which ended over ten years ago. Clark cites no authority maintaining that an ALJ is obligated to cite a specific quantum of medical records to meet his burden, and the Court is unaware of any authority requiring the ALJ to cite the record exhaustively.[6] The Court does note, however, that the

---

[5] Mental status examinations throughout the relevant period and beyond Clark's DLI often reflect he presented as "cooperative" (R at 437, 462, 492, 519, 882, 965, 1009, 1017, 1203, 2739, 3764) with a satisfactory attention span (R at 684–85, 3616, 3647, 3727), goal-directed thought processes (R at 437, 462, 492, 519, 882, 1009, 1017, 1203), linear, sequential and organized thought processes (R at 603, 965), adequate or good insight and judgment (R at 437, 462, 492, 519, 882, 965, 1009, 1017, 1203, 2740, 3765, 3728, 3785), and functional or intact memory, attention, and concentration (R at 943, 955, 980, 2739, 3711, 3728, 3799.) The ALJ cited intact memory, attention, concentration, goal-directed thought processes, and adequate insight and judgment among the clinical evidence supporting his decision to reject Dr. Buenker's opinion. (R at 4509.)

[6] "The ALJ is not required to methodically cite each item of evidence that she relies on in every section of her opinion where she relies upon it." *Kimbell v. Comm'r of Soc. Sec.*

ALJ's conclusions find adequate support in the record, which is more than a scintilla but less than a preponderance. *Orn*, 495 F.3d at 630. Inconsistencies between a provider's treatment notes and his functional assessment also constitute a specific, legitimate reason to reject that provider's opinion. *E.g.*, *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692–93 (9th Cir. 2009); *see* 20 C.F.R. § 404.1527(c)(3), (4) (affording greater weight to medical opinions that are well explained, supported by medical evidence, and consistent with the record). Consequently, the ALJ did not err by rejecting Dr. Buenker's opinion on this basis.

        b.  Activities of Daily Living

Citing his ability to manage his own finances, shop for groceries, perform housework, and live independently; the ALJ found that Clark's daily activities belied the conclusions that Dr. Buenker reached. (R at 4509.) Earlier in the decision, the ALJ cited a longer list, including references to out-of-state travel to Palm Springs and Las Vegas and going to the gym. (R at 4504.) This reason is also sufficient to reject Dr. Buenker's opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). The ability to engage in these activities (such as travelling and going to various public places) effectively belies some of Dr. Buenker's conclusions, such as Clark's being markedly limited, *i.e.*, effectively precluded, from interacting with the general public, performing activities within a schedule, and being punctual within customary tolerances. (R at 1283–84.)

Clark cites *Vertigan v. Halter* 260 F.3d 1044, 1049–50 (9th Cir. 2001) for the proposition that an individual must "spend a substantial part of his day engaged in functions that would be transferable to a work setting" for the ALJ to reasonably rely on evidence of daily activities. (Pl. Br. at 13.) The *Vertigan* Court, however, specifically addressed the transferability, or lack thereof, of a claimant's routine, daily activities to the workplace and the fact that some daily activities, despite requiring some physical exertion, are not transferable to the work setting due to the impact of pain. *Vertigan*, 260 F.3d at 1049–50. In other circumstances, the Ninth Circuit has affirmed the ALJ's reliance on daily activities

*Admin.*, No. CV-18-04113-PHX-SPL, 2019 WL 6522717, at *5 n.3 (D. Ariz. Dec. 4, 2019).

when they conflict with a claimant's statements about his or her own daily activities, or when they conflict with a provider's assigned restrictions, as is the case here. *See, e.g.*, *Rollins v. Massanari*, 261 F.3d 853, 856–57. (9th Cir. 2001).

The level of activity that Clark reported to his treating physicians—including socializing with friends, travelling for leisure, and exercising in public spaces (R at 804, 978, 981, 1402)—is plainly at odds with the level of restriction Dr. Buenker assigned. The Court finds this is a permissible basis to reject Dr. Buenker's opinion.

c. Other § 404.1527(c) factors

The ALJ did not err by failing to explicitly address each of the factors for evaluating medical opinion evidence enumerated in 20 C.F.R. § 404.1527(c).[7] The Ninth Circuit in *Trevizo v. Berryhill* held that it is legal error for an ALJ to reject a treating physician's opinion without applying or considering the factors in § 404.1527(c). 871 F.3d 664, 676 (9th Cir. 2017). Subsequent cases have clarified that an ALJ need not recite an explanation of each factor. *Kelly v. Berryhill*, 732 F. App'x 558, 562 n. 4 (9th Cir. 2018) (unpublished) ("The dissent correctly states that the ALJ is not required 'to make an express statement that she considered all the factors outlined in 20 C.F.R. § 404.1527(c).' Contrary to the dissent's assertion, however, the ALJ's decision here gives no indication that the factors were properly considered . . . ."); *see, e.g.*, *Forbes v. Comm'r of Soc. Sec. Admin.*, No. CV-19-05609-PHX-GMS, 2021 WL 1306197, at *1 (D. Ariz. Jan. 27, 2021) (motion to amend judgment granted) (citing *Kelly*). What is required is some indication that these factors were considered. *See, e.g.*, *Kelly*, 732 F. App'x at 562 n. 4.

Here, the ALJ provided ample discussion sufficient to convince the Court that he duly considered these factors. The ALJ extensively cited Dr. Buenker's own treatment notes and medical conclusions. (R at 4509.) The ALJ asserted that Dr. Buenker's opinions

---

[7] The regulation provides an ALJ must "**consider** all of the following factors in deciding the weight [to] give to any medical opinion": the existence of an examining or treating relationship; the "[l]ength of the treatment relationship and the frequency of examination[s]"; the "[n]ature and extent of the treating relationship"; supportability of the opinion; consistency with the entire record; the doctor's area of specialization; and other factors, including the physician's knowledge of disability program requirements. 20 C.F.R. § 404.1527(c) (emphasis added).

- 10 -

were inconsistent with the larger evidentiary record, which the ALJ summarized, in part, in support of his decision to reject Dr. Buenker's assessment. (R at 4509–10.) The ALJ's analysis establishes that he was aware that there was a significant treatment history and that he had considered Dr. Buenker's opinion in the context of the greater evidentiary record. For these reasons, the Court finds the ALJ met his burden under 20 C.F.R. § 404.1527(c).

The Court has established that at least two of the ALJ's cited reasons for rejecting Dr. Buenker's opinion are legally sufficient and that the ALJ did not otherwise commit legal error by failing to consider the regulatory factors found in 20 C.F.R. § 404.1527(c). Thus, even if the ALJ erred with respect to Clark's GAF scores and his conservative treatment, it would amount to harmless error. *Stout*, 454 F.3d at 1055. There is no need to address the ALJ's comments regarding Clark's substance use. (R at 4509–10.)

2. Dr. Jack Hawks

On May 22, 2017, Clark's treating family doctor, Jack Hawks, D.O. completed a Medical Source Statement to the Social Security Administration indicating Clark was limited to 10 pounds of lifting or carrying occasionally and 5 pounds frequently; standing or walking for less than one hour in an eight-hour day; using a cane for stability and ambulation; sitting for less than one hour in an eight-hour workday; alternating between seated and standing positions every 20–30 minutes; and needing to elevate both legs frequently. (R at 4478–79.) Dr. Hawks, responding to a series of yes-or-no prompts, indicated that Clark reported "Flare Ups" impacting his hip or thigh and knee or lower leg function, that he experienced limitations in lower extremity range of motion, and that he experienced functional loss and impairment in the lower extremity. (R at 4479.) Dr. Hawks indicated Clark had undergone bilateral total knee replacements and that he could not climb, balance, stoop, kneel, crouch, or crawl. (R at 4480.) Dr. Hawks noted the assessment "covered" the period of time from November 1, 2008, to the present. (R at 4481.) On January 31, 2020, Dr. Hawks completed follow-up assessments largely similar to the May 2017 assessment. (R at 5038–41.)

The ALJ assigned Dr. Hawks' opinions "little weight." (R at 4506.) The ALJ noted that Dr. Hawks is a general physician rather than a specialist and did not treat Clark prior to his date last insured. (*Id.*) The ALJ further noted that Dr. Hawks' opinion was inconsistent with the medical records and that he did not explain why the limitations he assigned had been present since November 2008. (*Id.*) The ALJ also noted diagnostic imaging of the hip revealed only mild findings prior to the date last insured. (*Id.*) Finally, the ALJ noted that Dr. Hawks' May 2017 statement was more restrictive than his January 2020 statement which, the ALJ believed, raised the question of whether Dr. Hawks' opinion was based on objective evidence.[8] (*Id.*)

          a.      Dr. Hawks' Specialization and Clark's Date Last Insured

The Court agrees with Clark that Dr. Hawks' specialization does not constitute a legally sufficient basis, standing alone, to reject his opinion. *E.g.*, *Young v. Comm'r of Soc. Sec. Admin.*, No. CV-19-05144-PHX-DWL, 2020 WL 5954073, at *4 (D. Ariz. Oct. 8, 2020). A treating physician's specialization might entitle him to more weight generally, 20 C.F.R. § 404.1527(c)(5), but as discussed in greater detail above, an ALJ must consider *all* factors listed in 20 C.F.R. § 404.1527(c), including the length of the treatment relationship and the supportability and consistency of the opinion. An ALJ could conceivably afford greater weight to a non-specialist physician's opinion on the grounds that that physician has treated the claimant for a lengthier period or that his opinion is more consistent with the medical record. *See* 20 C.F.R. § 404.1527(c).

Regarding his treatment history, Clark established care with Dr. Hawks years after his date last insured ("DLI") reporting longstanding hip and knee pain with impaired

---

[8] The ALJ's reasons for rejecting Dr. Hawks' opinions in the June 8, 2020, unfavorable decision are similar to the reasons the prior ALJ used in the September 5, 2017 decision, which was upheld by this Court in its September 2019 Order. (R at 2187–88, 4741.) In the September 5, 2017, unfavorable decision, the ALJ rejected Dr. Hawks' opinion because (1) he was a general physician and not a specialist; (2) he did not treat Clark prior to his date last insured; (3) his check-the-box assessment was not consistent with medical records showing no traumatic arthritis of the hip prior to the date last insured and only mild hip pain; and (4) the assessment failed to explain Clark's ability to function since November 2008. (*Id.*) This Court cited Dr. Hawks' lack of treatment prior to the date last insured and the relatively benign evidence regarding Clark's hip as sufficient reasons to reject Dr. Hawks' opinions. (R at 4741.)

1  function and needing disability paperwork completed. (R at 4941–43.) That a physician
2  provided an opinion after a claimant's DLI is not a specific, legitimate reason sufficient to
3  reject it. *E.g.*, *Lester*, 81 F.3d at 832. Though the timing of an opinion in relation to the
4  DLI is a permissible consideration, an ALJ cannot reject an opinion outright solely because
5  it was rendered after the DLI. *See Smith v. Bowen*, 849 F.2d 1222, 1225–26 (9th Cir. 1988)
6  (holding that post-DLI opinions are relevant). Medical opinions issued after the DLI are
7  still relevant to the period before the DLI, even if their weight is reduced. *See id*. In other
8  cases, however, the Ninth Circuit has explained that the opinion of a physician who
9  examined a claimant after his insured status expires "is entitled to less weight than the
10 opinion of a [doctor] who completed a contemporaneous exam." *Macri v. Chater,* 93 F.3d
11 540, 545 (9th Cir. 1996). Thus, the separation between Clark's DLI and Dr. Hawks'
12 treatment is a proper basis to discount Dr. Hawks' opinion, but not to reject it outright.
13 *Lindvay v. Comm'r of Soc. Sec. Admin.*, No. CV-18-02868-PHX-JJT, 2020 WL
14 831011, at *5 (D. Ariz. Feb. 20, 2020) ("The ALJ could have reduced the weight given to
15 the opinions because they were not near enough in time to the relevant periods in this
16 case."). Consequently, the Court finds it permissible for the ALJ to reduce the weight given
17 to Dr. Hawks' opinions on this basis. The Court now proceeds to the other reasons cited
18 by the ALJ.

19                    b.      Insufficient Explanation and Support

20      The ALJ rejected Dr. Hawks' opinions on the basis that they were "not consistent
21 with the medical records, [and did not] provide any basis as to why he opined that the
22 claimant's limitations had been present since November 2008." (R at 4506.) The ALJ noted
23 that objective medical evidence prior to Clark's date last insured did not establish traumatic
24 arthritis in the hip.[9] (*Id.*) A treating physician's opinion that is poorly reasoned and poorly
25 supported may be rejected. *Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion
26 of any physician, including a treating physician, if that opinion is brief, conclusory, and
27 inadequately supported by clinical findings.").

---

[9] In Dr. Hawks' 2017 assessment, he indicated Clark's diagnoses were osteoarthritis and traumatic arthritis of the hip. (R at 4478.)

- 13 -

The Court finds this reason sufficient here. It appears that Dr. Hawks' treatment of Clark began approximately nine years after Clark's alleged disability onset date, and over five years after the end of the insured period. (R at 4941.) Dr. Hawks indicated his disabling assessment "covers" the period beginning January 1, 2008, but he did not provide any explanation or insight into this conclusion. (R at 4481, 5037, 5041.) The ALJ reasonably concluded that such an explanation is necessary given when Dr. Hawks' treatment of Clark began and the lengthy period these assessments cover. While Dr. Hawks' assessments may still be relevant to the disability determination, it was not error for the ALJ to assign them little weight given the physician's lack of explanation.

The Ninth Circuit has held that an ALJ may still not reject a poorly explained assessment when the record supports the opinion. *E.g.*, *Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). But Dr. Hawks' records do not pertain to the insured period at all; in fact, they begin many years later and are comprised of only four treatment visits. (R at 4938–5034, 5044–45.) A review of those records might contain support for contemporaneous physical limitations, but there is little in these records to explain or justify the existence of physical limitations during the period of Clark's insured status.

Clark presented to Dr. Hawks on May 22, 2017, with the express purpose of "hav[ing his] disability paperwork filled out so that he can apply for his disability." (R at 4941.) Clark reported "a long-standing history of hip pain as well as knee pain" limiting his ability to function. (*Id.*) Dr. Hawks noted that Clark exhibited tenderness and crepitus in the bilateral hips with decreased range of motion on the left and bilateral medial and lateral joint line tenderness in the knees with decreased range of motion on the left. (R at 4942.) Dr. Hawks completed his first assessment of Clark the same day and, presumably based on this one examination, he assigned disabling limitations dating back nearly a decade before that first visit. (R at 4478–81, 4941–43.)

On July 12, 2017, Clark reported a fall onto both knees. (R at 4975.) On examination, Clark showed decreased range of motion with crepitus and pain in the right shoulder, swelling and tenderness in the right elbow, effusion with decreased range of

motion in the knees, and decreased range of motion in the lower back. (R at 4976.) Dr. Hawks referred Clark to an orthopedic surgery; ordered x-rays of Clark's knees, right shoulder, and right elbow; and directed Clark to return to his clinic in around a month. (R at 4976–77.) Clark did not return to Dr. Hawks' clinic for almost two-and-a-half years, when he was evaluated by a nurse practitioner for a thyroid nodule. (R at 4998.)

Clark reconnected with Dr. Hawks in January 2020 reporting he needed "forms filled out." (R at 5033.) Dr. Hawks completed two work-preclusive forms the next day. (R at 5035–41.) Clark followed-up again in March 2020 with reports of ongoing knee issues and continuing, but stable, lower back pain. (R at 5044.) Dr. Hawks noted an updated knee x-ray would be required to "check the replacement status" of Clark's prior surgeries. (R at 5045.) A left knee x-ray from the next day showed "[n]o radiographic evidence of hardware complication." (R at 5042.)

Dr. Hawks' records illustrate that Clark experienced ongoing symptoms in the knees and low back in sporadic visits from 2017 and 2020, but these records do not provide the type of evidence sufficient to undermine the ALJ's conclusions. The ALJ also cited evidence of only "mild joint space narrowing" in a June 2010 right hip x-ray (R at 387, 4506) which also belies Dr. Hawks' opinion.

Clark asserts that Dr. Hawks' opinion is based on his knee impairments and his moderate-to-severe left knee arthritis in February 2010, prior to his surgery. (Pl. Br. at 17.) Earlier in the decision, however, the ALJ also cited evidence that Clark's left knee had improved and stabilized after his September 2010 surgery and post-operative infection. (R at 4502.) Such evidence included diagnostic imaging indicating Clark's left knee was weightbearing and stable. (R at 866–67, 3265.) Clark's orthopedic surgeon indicated in March 2011 that his range of motion was vastly improved with full extension. (R at 445.) Overall, substantial evidence supports the ALJ's conclusions.

The ALJ provided two legally sufficient reasons to reject Dr. Hawks' opinions. Thus, regardless of whether the ALJ erred when making other determinations regarding Dr. Hawks' medical opinions, the Court must affirm the ALJ's decision with respect to Dr.

Hawks' medical opinion. *See Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (an ALJ's error is harmless when he or she cites permissible reasons along with impermissible reasons).

### 3. Dr. Paul Fredette

On July 28, 2016, psychiatrist Paul Fredette, M.D. completed an assessment of Clark's mental capacity for work activity. (R at 2636–42.) He indicated that Clark suffers from PTSD and experiences symptoms including sleep disturbances, emotional lability, intrusive recollections of prior trauma, and hostility and irritability. (R at 2636.) Dr. Fredette indicated that while Clark's condition had improved with medications and his overall prognosis was "fair-to-good," (R at 2637), he still experienced "moderate" limitations in his ability to maintain attention for two-hour segments, accept instructions and respond appropriately to supervisory criticism, get along with coworkers and peers without being unduly distracted, interact appropriately with the public, and maintain socially appropriate behavior (R at 2639–40).[10]

The ALJ assigned "little weight" to Dr. Fredette's opinion, noting that Dr. Fredette did not indicate that the limitations he assigned covered the insured period; that he did not treat Clark during that period; that he merely "checked boxes on a form without any explanation"; and that his opinion is "not entirely consistent with the objective medical evidence" summarized previously, which indicated in part that Clark's symptoms were well-managed. (R at 4508.)

Clark only explicitly challenges the ALJ's rationale that Dr. Fredette did not treat Clark before his date last insured and did not indicate (as Dr. Hawks did) that the limitations he assigned existed on or before Clark's date last insured. (Pl. Br. at 16.) Citing *Smith v. Bowen*, Clark insists that this is not a specific, legitimate basis to reject Dr. Fredette's opinion as "[i]t is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." *Smith*, 849 F.2d at 1225.

Importantly, however, an assessment's relevance to the issue of disability does not

---

[10] The assessment form defines a "moderate" limitation as one that precludes performance of activity between 17% and 32% of the workday or work week. (R at 2638.)

- 16 -

dictate its acceptance by the ALJ. Every medical opinion in the file, to one degree or another, is likely relevant to the issue of Clark's disability, but relevance and weight are separate considerations, and an ALJ need not accept as true every relevant medical assessment. In fact, it is the ALJ's job to resolve these differences. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995). The Ninth Circuit has upheld rejection of a post-DLI treating source when the physician fails to specify when the limitations began. *See Watkins v. Astrue*, 357 Fed. App'x 784, 786 (9th Cir. 2009) (affirming rejection of a treating opinion when the assessment is not apparently retroactive to the DLI). Moreover, the ALJ did not reject Dr. Fredette's opinion "solely on that basis." *Smith*, 849 F.2d at 1225. The ALJ provided a host of other facially legitimate reasons which Clark does not challenge. Thus, the Court refrains from reversing the ALJ on this basis.

### B.     Clark's VA Disability Rating

The Department of Veterans Affairs ("VA") issued Clark a combined disability rating based on the severity of his lumbar degenerative disc disease, bilateral lower extremity radiculopathy, trochanteric pain syndrome, total left knee arthroplasty, and right hip degenerative disc disease. (R at 2489–93.) Clark's combined disability rating ranged from 70–100% during the period of insured status. (R at 2492.)

In the decision, the ALJ addressed Clark's VA disability rating by noting the differences between the VA disability and Social Security disability programs. (R at 4510–11.) The ALJ also noted that the record before the VA did not include key evidence, such as consultative examinations not supportive of disability, evidence that Clark did not utilize a cane for ambulation except for the period he was recovering from surgery, evidence that the Clark "may have altered a medical source statement," and evidence suggesting Clark's "focus" was on getting benefits instead of treatment. (R at 4511.) The ALJ asserted that the VA had not considered Clark's statement that he will go back to work "if he has to" and activities documented in his treatment records, such as joining a gym, using a treadmill, travelling out of town, and getting married in Las Vegas. (*Id.*) The ALJ also noted that the opinion of an independent medical examiner that Clark's subjective complaints went "far

beyond" the medical evidence. (*Id.*)

Clark argues that the ALJ erred by rejecting the VA disability rating. (Pl Br. at 18–22.) Clark asserts that VA disability ratings are generally entitled to "great weight" under *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002), and that the ALJ's rationale that the two disability programs operate under different rules is legally insufficient. (*Id.* at 19–20.) Clark "strongly objects" to the ALJ's reliance on an allegedly tainted medical source statement to impugn Clark. (*Id.* at 21.) Clark also notes that the consultative examiner upon whom the ALJ relied concluded that Clark requires the use of a cane for ambulation, contrary to the ALJ's finding he does not. (*Id.*) Clark faults the ALJ for relying on his daily activities not transferable to a work setting and—noting the ALJ's reliance on the independent examiner, who opined that Clark's complaints exceeded the medical evidence—for insisting that his subjective symptoms be objectively verified. (*Id.* at 22.)

The Commissioner notes that Social Security regulations distinguish between disability decisions by other governmental agencies, that Social Security is not bound by those decisions, and that a VA disability rating does not mean an individual is incapable of work. (Def. Br. at 15–18.) The Commissioner also highlights that a VA disability rating may be rejected by citing "persuasive, specific, valid reasons for doing so that are supported by the record," *McCartey*, 298 F.3d at 1076, and that the District of Arizona previously upheld the ALJ's rejection of the VA disability rating in this case when the ALJ used an almost identical rationale. (*Id.* at 19.)

The Court finds that the ALJ cited persuasive, specific, and valid reasons for rejecting the VA ratings decision. *McCartey*, 298 F.3d at 1076. The Court also finds that the ALJ's citations to Clark's activities (*e.g.*, R at 804, 1402, 1670, 1691) and his statements regarding work (R at 423) are sufficiently persuasive to belie the VA's conclusions regarding the severity of his impairments. Moreover, while the ALJ does not definitively conclude that Clark altered a medical source statement (*See, e.g.*, R at 4505), it appears that Clark may have acknowledged altering the assessment to another treatment provider. (R at 3527.) The Court does not endeavor to make independent factual findings

inconsistent with the ALJ's decision. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (maintaining that resolution of conflicts in the evidence are the sole function of the Commissioner). The Court does note, however, that in light of Clark's acknowledged alteration, the ALJ's citation to the altered assessment constitutes a persuasive, specific, and valid reason to reject the VA decision. *See Light v. Soc. Sec. Admin., Comm'r*, 119 F.3d 789, 792 (9th Cir. 1997) (When evaluating his symptom testimony, "the ALJ may consider [the claimant's] reputation for truthfulness . . . .").

## V. CONCLUSION

The Court finds that the ALJ cited legally sufficient specific, legitimate reasons for rejecting the opinions of Clark's treating physicians and persuasive, specific, and valid reasons for rejecting Clark's VA decision. (R at 4513.) Accordingly,

**IT IS ORDERED** affirming the June 8, 2020, decision of the Commissioner of Social Security (R at 4494–4513).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

Dated this 5th day of July, 2022.

Michael T. Liburdi
United States District Judge